The final case this morning will be number 2313573, Telma Hall v. Alabama State University. This case is number 2313573, Telma Hall v. Alabama State University. Good morning, Your Honors. My name is Chauncey Hunter Ridgway and I am here representing the Appellant and Cross Appellee, Alabama State University. I appreciate Your Honors allowing us some time for a conversation about multiple issues that we've got before this Court. I'll focus on the overarching reason behind why we have submitted these issues to the Court and that this is a case that never should have proceeded to trial. And even when it did proceed to trial, it should have been decided as a matter of law. For some context, Your Honors, this case proceeded under multiple magistrate judges at the district court level and the only claim that survived to the trial phase that was raised by Ms. Hall was her gender discrimination claim with respect to her paid suspension. That is the only claim that went to trial. We submit to the Court that that claim in and of itself also should have been disposed at the summary judgment stage. ASU challenged the surviving of the paid suspension claim under Title VII at every opportunity at the summary judgment stage. I don't think anybody is contending you waived anything. No, Your Honor. You're telling us why I was wrong. Well, Your Honor, jumping ahead then, the overarching reason that we believe that the district court got it wrong is because of the standard for an adverse employment action and that underlies the crux of why we're here today. Specifically, this court in its decision in Davis v. Legal Services, we submitted that case to the district court at the summary judgment stage, again, trying to stop the case from going forward as a matter of law. But we're past that. Yes, Your Honor. The paid suspension claim went to trial with a jury. Yes, Your Honor. The Supreme Court has held repeatedly that once you get to a jury trial, forget about prima facie case. If you don't . . . If you're talking about the elements of the Title VII cause of action, for example, and the Supreme Court has said you don't have to have a change in the terms and conditions of employment. You just have to have harm, right? Well, Your Honor, I think you are getting at the Muldrow case issued by the Supreme Court. Your Honor, if I may, I'd like to distinguish that case and I'll take your question in two parts. How about taking the rule that harm to the employee, the plaintiff, is sufficient? Well, Your Honor, in that case that you're referencing, the Muldrow case, that harm to the plaintiff is sufficient. That case was actually dealing with a distinct context in dealing with a transfer of an employee. If you transfer an employee or you suspend them, and the question is, but did it harm them? It's harm either way. You can harm somebody from transferring them, probably less than you can harm somebody from suspending them, but regardless, Muldrow talks about you've got to show harm to make out a Title VII claim, and they've shown that, have they not? Well, Your Honor, respectfully, the Muldrow case, we would assert, is limited. Now, what's important about the Muldrow case is that it was a companion suit to this Court's decision in Davis. Now, Muldrow was taken up by SCOTUS in the context of a transfer, which, as Your Honor recognizes, is similar to a suspension, but the Supreme Court denied cert on the Davis case. Now, the Davis case does not set out a lower threshold of some harm, as Your Honor pointed out. What the Davis court sets out is that a paid suspension is a useful tool for employers to investigate employees that have been . . . We have not denied cert in the Davis case, and denials of cert they've held so many times aren't precedent, and lower courts don't have to follow them, and we've held the same thing. Denial just means we're not going to hear it right now. If you would, and I understand your argument, I'll consider it about Muldrow, that doesn't apply here, but assume it does, and assume that you don't have to prove an adverse employment action. All you have to prove is an employment action that caused some harm. Now, are you arguing that the suspension didn't cause any harm to the plaintiff? Well, Your Honor, as to the suspension, I think that is where looking at the distinction between transfer and suspension comes into play. The suspension left Ms. Hall in the position of remaining gainfully employed. Yes, but that's not the question. If you would assume with me that Muldrow applies, and that even if continuation of employment doesn't get disrupted, and that some other harm is enough, some other harm, and it doesn't have to be substantial, they say, is it your position that she had no other harm because of the suspension? Yes, Your Honor. Our position is that she did not have harm because the suspension was in place not only to allow her to remain employed while we investigated . . . She wasn't allowed to teach a class. Your Honor, but she was not terminated until . . . She wasn't terminated. That's part of the question, and she received her salary, but the definition of my question, and you can argue that Muldrow doesn't apply and his premise is wrong, I understand that. But if I disagree with you, and we disagree with you, or we don't, but the question is, did she suffer any harm short of a discontinuation of employment? Your Honor, short of a discontinuation of employment, I'm sure Ms. Hall's position is that she did suffer harm. I'm sorry, I'm asking you your position. Did she suffer harm or not? I mean, look, part of effective advocacy is admitting the things that's contrary to your position and then going ahead and explaining them. We can't move on to the then going ahead until you confront the question of, wasn't she harmed by the suspension? In a practical sense, yes. Because she was banned from the campus? Yes. She was told she could go to her office except under guard, basically. She was not allowed to take free courses, a free course, and if you believe, as I'm sure we all do, that an ASU course is valuable, being deprived of the opportunity to take it because it's not free and you can't go on campus, that's harm, isn't it? Real harm. That is real harm. I'll concede that, Your Honor. Ms. Hall was asking this whole time. That is harm, but I would distinguish the facts here. Ms. Hall does not present any evidence of record that she ever actually expended any funds out of pocket to where she was deprived, realistically, of the benefit of her free tuition courses. There also is no evidence of record that she made any arrangements to try to complete those courses virtually and furthermore, Your Honors, in terms of Ms. Hall being able to take those courses, that was not a term or condition of her employment as the head softball coach for the university. What this court has looked at in considering adverse employment actions is if there is some serious and material change in the terms, conditions, or privileges of employment. Does that go to the fact that she was, in fact, harmed? That instead of just, to use the language of Davis, the simple paid suspension of her teaching duties, she was also told that she could have no contact with students. She was told she couldn't be on campus to take the classes and she also couldn't teach the classes, things that were, in fact, outside of her terms and conditions of coaching. Doesn't that actually speak to the fact that she was harmed way beyond the Davis situation you're talking about? I would concede that it speaks to the harm, but I would respectfully disagree with the court that it is beyond the confines of Davis. Comparing and contrasting Davis to Ms. Hall's case, in the Davis case, the court was looking at a plaintiff that was a high-profile employee. They were looking at a situation where the Legal Services of Alabama posted an armed security guard outside of the building, a situation where that plaintiff was the face of that organization and precluded from participating, I believe, in a couple of days following the paid suspension, a very high-profile state bar event. We submit to the court that Ms. Hall's position here is within the confines and lesser confines than the facts that were at play in Davis, specifically Ms. Hall being the coach of Alabama State University's softball team. She faced very serious allegations. The accusations against her are what triggered the paid suspension. Those accusations being accusations that directly spoke to the student's welfare, things like dehydration to the point of hospitalization, things that implicated hazing, which we know in a broad sense. You've kind of moved on past the question that we were talking about, the adverse employment action. You're talking about the things that caused her to get suspended. Can I shift you to the comparator argument that you have raised? Can you explain to me how the fact that the change in presidents, we were looking at Coach Melendez versus Coach Hall, and you have pointed to the fact that, hey, the president was ultimately responsible for these suspensions, and they were different presidents, but can you explain how the change in presidents matters when both Hines and Knight were in ASU's chain of command during both the Melendez investigation and the Hall investigation? Your Honor, I'd raise a couple of points to that question. These courts' decisions in Lewis and Hester point out that the continuance of the same decision maker is key for evaluating the comparator question. Now, as far as the timeline, Ms. Boyd got to the university, or Dr. Boyd, excuse me, got to the university in February of 2014. It was within mere weeks, March 2nd, 2014, and March 3rd, 2014, that the university receives complaints from the parents and students alike. Those complaints went not only to Athletic Director Hines, but they went to Dr. Boyd herself. Dr. Boyd was not in place at the time that the allegations against Coach Melendez were raised. She did not have actual knowledge of the allegations against Coach Melendez, and that goes directly to her discriminatory intent. Well, I agree much, as I did in my question, that there were different presidents in place, but what we do have is a situation where, particularly with Knight, who was the vice president, that with Knight and with Hines being involved in both of these investigations of coaches, how does that not make these proper comparators? Your Honor, I think the most straightforward answer to that is that the ultimate decision making power rested with Dr. Boyd. That is something that we challenged at the district court level. You're getting at the cat's paw theory that was raised at the trial. That was something that the district court did question because it was not raised in the complaint, although it ultimately was allowed as a jury instruction, but Dr. Boyd was the one who had the actual decision making power as set forth in the university's policies and procedures. She was the only one who could actually approve this suspension. But the district court did hold that Dr. Boyd displayed a shifting recollection about receiving additional information prior to approving Hines' recommendation, and there were some inconsistencies between the testimony and the timeline that was established by the evidence. In fact, it was unclear whether Dr. Boyd was involved before the suspension. It may have been that Dr. Boyd got involved after the suspension, which is why the cat's paw came into play. But I have one final question. Do you have a case saying that Coach Hall had to plead a cat's paw theory? Or are you just simply saying there's not sufficient evidence of a cat's paw theory? Your Honor, we don't have a case and we're saying there's not sufficient evidence of a cat's paw theory looking to the general procedural rules of pleading. And I won't belabor that point because we recognize that it was allowed at trial, but I think that it boils down to per the university's policies and procedures, the decision maker was Dr. Boyd. Thank you. Thank you, Your Honor. I'm Sam Heldman for Coach Hall. I sometimes speak at too much length and I will try not to do that today. On the concept of harm and adverse action, I would like to add to what the Court was discussing. The other harm, too, was they wouldn't tell Coach Hall even what she was accused of or why. They didn't ask for her side. She's in a Kafkaesque nightmare. Why are they doing this to me? She asked even the investigator who called her. Why? What are the allegations? I won't tell you. No one would tell you. And that, the record shows, was in violation of the university's own norm and policy. The President Boyd admitted that. The 30B6 HR person admitted that. That's a terrible harm. On top of the harm of you go home, you can't work, you can't teach your adjunct class, you cannot take your class and get that employment benefit, there's a lot of harm in this case. And the jury, frankly, recognized it with a large compensatory verdict. And we're here after a jury trial. I think if the Court would like to discuss, the Court doesn't need my help in how you write an opinion after Muldrow about what's left of Davis, but if the Court would like to discuss that, I can. My belief is that really, Davis didn't say that a suspension without pay can never be actionable. After Muldrow, we know that's not the rule. You at least have to look at the surrounding circumstances. And here the circumstances were such that there was, in the words of Muldrow, some harm. And Muldrow tells us the harm doesn't have to be substantial, it doesn't have to be material, it doesn't have to be tangible, it certainly doesn't have to be economic. That's the rule. And, you know, it's a change from the rule that this Court followed and most courts followed for years, but that's the rule now. It just has to be some harm. And here, there was a great deal of harm. On the topic of the President being new, again, we're here after a jury trial. On this, their argument that they should have had summary judgment is completely irrelevant. It's a totally fact-bound argument. You can't go back and argue after trial that you should have had summary judgment on a fact-bound argument. And here, their argument about the President depends entirely on their assertion that the President made an informed, independent decision. And the jury, quite wisely, did not buy that. The district court, in the passage that Your Honor read, said about as plainly as I've ever read a district court say in a civil case, gee, Dr. Boyd was a terrible witness and the jury was well-warranted in disbelieving her assertion that she made an independent judgment. As we explain in our brief, you've got Hines and you've got Knight, both of whom were integrally involved in letting Coach Melendez slide. Even letting Coach Melendez retaliate against the kid who blew the whistle on him. They let that happen with no consequence to Melendez. Then, here comes the female, Coach Hall, and they go, we've got to get rid of this lady. We've got to suspend her. Are you arguing to uphold, I mean, your specific argument, and it's a proper answer to say both, but are you arguing in support of your suspension verdict for the jury or against the summary judgment verdict termination? At that moment, Your Honor, I was arguing on the suspension verdict. Maybe you ought to raise one hand when you're arguing on one. Let me ask you this. I was at first in full agreement with you, there's no way to reconcile these two. Of course, that doesn't mean the one you want overturned is the one that will be overturned to reconcile them, but I want to challenge that position and see what you think about it. Yes, sir. At the suspension stage, which went to the jury, they had not argued. I know they didn't profit, but at least I don't think they profited. They didn't argue before the jury. The real reason we fired her is she had a 28% record over a long period of time. That wasn't argued to the jury, was it? No, Your Honor, it wasn't, because that was not offered as a reason for the suspension. You're right. I don't understand that completely, except maybe they couldn't argue that because it wouldn't make sense to suspend somebody for having a losing record over a period of years. And you certainly wouldn't ban them from campus. But they did argue that as a proffered reason on the termination, did they not? They did, Your Honor, and that came up as a proffered, legitimate reason years after the fact in the deposition of the liar, discriminator, Hines. You would admit that when the dust settled, the reason they had fired your client was that she had a 28, actually 29 if you round up, percent record over all these years. I mean, I noticed you have a 202 area code. You may not be familiar with Alabama collegiate sports. I understand, Your Honor. Auburn University fired four coaches in the space of 10 years, one of which the year before had won a national championship. Another one who had just completed an eight victory season when they fired. So, the culture one could suggest is that 28% is a valid reason for terminating someone's employment, particularly after the number of years. You don't contest that. I agree with the principle in this sense, Your Honor. If they had said from the beginning, Coach Hall, we are terminating you because you are not a good, we need a better coach. If that is what they had told the unemployment office, if that is what they had told the EEOC, and if that is what they had said in their summary judgment brief, we terminated this lady because we wanted to win more games. I would have a very, very, very hard case. But that is not this case. They did profit. They did. How many years after the termination did they profit? It is covered in our brief, and I think what I wrote there when I was very familiar with it, was that was a deposition of Heinz where it popped up three years after the termination.  For the first time. That is the way I read it. It seems astounding to me. It is, Your Honor. I think that if we had a trial on that, or let's talk about summary judgment. I think a reasonable finder of fact on this whole, we are talking about the summary judgment record now, could say, okay, look, first you have this big bomb of evidence that these folks are discriminators. And no one would tell them why. Yeah. They just wait three years to put this in. You are saying that is in the formulation we have said of any weaknesses, improbabilities, contradictions in the evidence, et cetera. Yes, Your Honor. You got the evidence that they discriminated against her two months earlier on the suspension. So, they are discriminators. Now, would a jury have to find that they were not discriminators in May when they terminated her because her one loss record was bad? No, I think the finder of fact could reasonably say, well, number one, they discriminated against her on the basis of sex two months ago. Number two, they have given us, they started off with reasons that they no longer advance as reasons. Inappropriate actions towards students, which sounds very nefarious. Then they go to, well, she was under NCAA investigation. Well, so was Melendez. Then they say, well, her contract was coming to an end. Well, that is not a reason to fire her. That is just a reason to make a decision. Then and only then, they say, she was not winning enough. And I think, I believe a reasonable finder of fact on this unique record could say, I do not have to buy that that was the only reason. Again, you know, the statute. I do not want to believe that. Exactly. Yes, Your Honor. I appreciate that. Okay. I do not feel the need to take more of the Court's time, but I am happy to discuss anything further. Hearing nothing, thank you.  Thank you, Your Honors. Briefly. First of all, I will speak to the fact that Ms. Hall was not a classified employee. She was a special athletic appointee that was not entitled to the same due process as classified employees were. Counsel opposite raised the issue that Ms. Hall was not told why she was being suspended. But in fact, she was told that she was being investigated for allegations by the students and parents that concerned jeopardy to the students' welfare. Furthermore, Your Honor, the jury did not have the opportunity to hash out the issues of law. Every plaintiff is going to say that they were harmed, but ASU took the least harmful route that they could, which was using that tool of paid suspension to investigate those allegations against Ms. Hall and have her, have the students be able to come forward without Coach Hall overlooking them, something that this Court highlighted, the inherent in power balance in the Davis decision. Finally, Your Honors, what I think the overarching question here is what would ASU and universities in general, what are we to do if we cannot affect the use of a paid suspension to investigate claims as egregious as those against Ms. Hall if we have to fear the ramifications of Title VII liability? Again, this was the least harmful path that ASU could have taken to investigate the allegations against her. And with respect to the reasons articulated for Ms. Hall's suspension and termination regarding her win-loss record, we had a pandemic in the middle of this case. And so, there were years that went by before that issue came out. All of the reasons for Ms. Hall's suspension were articulated and testified to by the Athletic Director Hines. And so, Your Honors, for these reasons, we would ask that the Court reverse the decision of the District Court. Thank you. Thank you both, Your Honor. Well, this concludes our arguments for this morning and the Court will be in recess until 9 a.m. tomorrow morning. All rise.